FILED

2008 Oct-30  PM 01:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN  DIVISION

| | | |
|---|---|---|
| **BRUCE A. BAKER,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | **CIVIL ACTION NO.** |
| **BIRMINGHAM BOARD OF EDUCATION,** | ] | **2:06-CV-233-VEH** |
| | ] | |
| | ] | |
| **Defendant.** | ] | |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the court is the Motion for Summary Judgment (Doc. 13) of the Defendant, the Birmingham Board of Education ("BBOE") as to the claims of the Plaintiff, Bruce A. Baker ("Baker") in their entirety.

This is an employment discrimination case.  Baker claims that the BBOE intentionally discriminated against him because of his race (Caucasian) and retaliated against him for attempting to report an incident wherein he alleged that his supervisor discriminated against Baker because of Baker's race.

The parties have submitted their briefs to the court.  (Docs. 14, 18, 20.)  The court has carefully considered each of the arguments and is of the disposition that the

Motion for Summary Judgment (Doc. 13) is due to be **GRANTED**.

## II.      STATEMENT OF THE FACTS[1]

### A.      Baker's Background and Employment with Arthur Elementary

Baker, a Caucasian male, was employed with the BBOE from August 1995 until March 2003.  (AF # 1.)[2]  A decorated former basketball star, Baker attended the University of Alabama-Birmingham, where he received a certificate to teach health and physical education for kindergarten through the twelfth grade.  (AF # 3; AAF # 1-4.)

Baker began working for the BBOE as a PE teacher at Arthur Elementary School and, after several years of service, Baker obtained tenure.  (AF # 5; AAF # 13.)  During this time, he received a satisfactory rating for classroom maintenance,

---

[1]  If the facts are in dispute, they are stated in the manner most favorable to the non-moving party. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Accordingly, these are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[2]  The designation "AF" stands for "admitted fact" and indicates a fact offered by the BBOE that Baker has admitted in his written submissions on summary judgment or in his evidentiary submissions in response to Defendant's Motion for Summary Judgment.  Whenever Plaintiff has adequately disputed a fact offered by Defendant, the court has accepted Plaintiff's version. The court's numbering of admitted facts (e.g., AF No. 1) corresponds to the numbering of the BBOE's Statement of Facts, as set forth in Doc. 14 and responded to by Baker in Doc. 18.  Similarly, the designation "AAF" refers to "additional admitted fact" and corresponds to Baker's Statement of Facts contained in Doc. 18 and responded to by Defendant in Doc. 21. Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

but it was also noted that he needed to improve hallway and line management.  (AF # 7.)

Between August, 2000, and January, 2001, there were numerous accidents in Baker's classes that resulted in injuries to his students.  (AF # 12.)  Baker was absent from school for ten days between August 14, 2000, and February 1, 2001.  (AF # 13.)  During these absences he failed to provide a substitute, as school policy required.  *Id.*  On February 2, 2001, Baker failed to follow the appropriate procedures for reporting his absences and, as a result, his classes were cancelled.  (AF # 16.)

In May, 2001, Baker was granted four weeks of medical leave due to pain in his back and an injury in his thumb.  (AF # 18.)  This leave continued until the end of the school year.  *Id*.  Baker has had several surgeries in the past for his back injuries and, as a result of the surgeries, he is unable to lift objects of significant weight.  (AAF # 7.)

## B.   Baker's Employment at Norwood Elementary School

While on leave and prior to the 2001-2002 school year, Baker transferred to a new school, Norwood Elementary School ("Norwood"), a school largely comprised of African-American students, where he also taught physical education for kindergarten through the fifth grade.  (AAF # 15-16.)

Baker first met the principal of Norwood, John D. Brown ("Brown") in August,

3

2001, on a teacher work day.  (Def's Ex. 4 at 51-52.)  At a faculty meeting on that day, Brown introduced all of the new faculty members, except for Baker.  (Def's Ex. 4 at 50-51.)  Later that same day, Brown informed Baker that he did not want Baker to have much interaction with the students, but that Baker would essentially do book inventory and teach a fifth grade class.  (Def's Ex. 4 at 51:20-23.)

When Baker arrived at school on the second day that students were in attendance, the former P.E. teacher, Coach Gholston, was at the school and began the class without introducing Baker to the students.  (AAF # 18-19.)  Shortly after this class began, Brown ordered Baker to come to his office for a meeting.  (AAF # 20.)  During this meeting, Brown threatened to cite Baker for insubordination if he did not interact with the students in a more satisfactory manner, although Baker did not understand what his duties actually were.  (Def's Ex. 4 at 55-56.)

Following this meeting, Brown, an African-American, told Baker that he did not want Baker at the school and that Brown  would have preferred to have an all African-American staff.  (Def's Ex. 4 at 57:7-12.) Baker responded to Brown that it might be necessary to bring Sherry Huff, a Program Specialist, to the school.[3]  (Def's Ex. 4 at 57:18-23.)  Later in the day, Baker received a note in his box from Brown

---

[3]  Testimony indicates that Sherry Huff, a Program Specialist, would have had authority to address the dispute between Baker and Brown.  (Def's Ex. 1 at 106-109; Def's Ex. 4, 58-59.)

stating that if he did not follow orders, he would be written up for insubordination and that Baker had no right to request a Program Specialist.  (Def's Ex. 4 at 58:7-11.)

Baker was not permitted to make phone calls on the office phone regarding this incident, and Brown told Baker that, if he reported him, he would deny the incident. (Def's Ex. 1 at 107:12-23.)  Baker called the Program Specialist from his home to report the behavior.  (Def's Ex. 4 at 58-59.)

A few weeks later, Brown called a faculty meeting and informed the staff that Baker could not handle his responsibilities and that Baker would be placed on observation.  (Def's Ex. 1 at 110-111.) Baker was told to "shut up" when he argued that the number of students he was asked to supervise was in violation of the law.  *Id.*

Shortly after Baker began his employment at Norwood, Brown began receiving complaints from parents that students were being injured in Baker's class.  (AF # 23.) Baker was not using the required form to document injuries to students.  *Id.*

On September 6, 2001, Baker sent for Brown during his class because Baker's fifty to sixty fifth grade students were out of control.  (AF # 25.)  Brown did not come to the gym, but instead sent Baker a memorandum concerning classroom discipline. *Id.*  Brown also instructed Baker as to disciplinary procedures that required calling parents.  (AF # 26).  Baker responded that he would not spend significant time calling parents after school, because he "had a life after school."  *Id.*  Baker was written up

5

for insubordination following his failure to attend a meeting with Brown regarding classroom management.  (AF # 27.)

On October 10, 2001, Baker reported that he had an appointment with a doctor on the following day and that he would try to be present at 9:30 but that he might not be able to attend work at all.  (AF # 37.)  Baker did not attend work after the appointment and, as a consequence, he was reprimanded for failing to properly follow reporting procedures.  (AF # 38.)

On October 15, 2001, classes at Norwood were scheduled to dismiss earlier than was customary.  (AF # 41.)  Baker was scheduled to have a particular fourth grade class at 10:30 A.M. on that day, but the class's teacher, Ms. Anderson, sent the children to the gym at 10:00 A.M.  When Baker told the class that they were early, the students became irate, calling him a "fucking cracker." (AAF # 28.)

Anderson returned her students to the gym at the scheduled time, and the students again were restless.  (AF # 45.)  One student in particular, Timothy Moultrie, was repeatedly causing disturbances.  *Id.*

Moultrie was a student who had a history of disciplinary problems.  He had been in fights at school prior to October 15, 2001.  (AAF # 62.)  He had been moved in his classroom several times to keep him from causing disturbances with other students.  (AAF # 63.)  Ultimately, because of his behavioral problems in Ms.

Anderson's class, Moultrie was placed in a special seat next to Ms. Anderson's desk. (AAF # 64.)

Baker told Moultrie to sit down approximately three times, but Moultrie refused. (AAF # 33.) Moultrie left the class without permission and, when he returned, he began to use the gym phone to call his mother. (AAF # 34.) While Moultrie was talking to his mother, Baker yelled at Moultrie, took the phone and hung it up. (AF # 46.) Concerned for her son, Moultrie's mother immediately left work and came to the school. (AF #47.)

When Baker took the phone from Moultrie, the student began hitting Baker with his fists in the lower part of his back, at the site of his previous surgeries. (AF # 49; AAF # 37, 53.) The pain was so intense that Baker became sick to his stomach and began to see stars. (AAF # 38.) Immediately after the event, Baker stated that he intended to file assault charges against Moultrie. (AF # 53.)

After filling out an incident report form, a conference was held that included Baker, Earlene Mohon ("Mohon") a school counselor, Christine Lyons ("Lyons") an intervention specialist, Vanetta Newton ("Newton"), a teacher, and Moultrie, along with his parents. (AF # 53-55; Def's Ex. 10.) The purpose of this conference was to investigate the above-described incident between Baker and Moultrie. (AF # 55.)

During this initial meeting, Moultrie's father and then Newton asked whether

Moultrie had uttered any racial slurs to Baker.  (AF # 43-46.)  To these questions, Baker responded that if the meeting was "an inquisition," he would not answer any questions without a lawyer.  (AAF # 47.)  Baker then left the meeting and went to the office downstairs.  (AAF # 48.)

After the meeting, Baker returned to the room, confronting Moultrie's father. (AF # 62.)  He attempted to goad Moultrie's father into fighting him.  *Id.*  Newton and Lyons separated the party and the meeting ended.  *Id.*

After the parties had time to calm down, Dr. Debra B. Patterson ("Patterson") the area director for the BBOE, initiated a second attempt at a meeting.  (AF # 63.) In addition to the parties at the first meeting, Brown also attended.  (AAF # 52.) Baker interrupted the meeting soon after it started to declare that he believed everyone was conspiring against him.  (AF # 66.)

After the second meeting, Patterson received a call from Jeff McDaniel ("McDaniel"), a representative of the Birmingham Education Association, who had talked with Baker over the phone earlier.  (AF # 68.)  McDaniel advised Patterson that Baker should be sent home for fear of imminent danger.  *Id.*  Baker was sent home and immediately placed on administrative leave.  *Id.*  Security was called and a report was made against Baker.  (AF # 72.)  All of the participants in the two meetings recommended Baker's termination.  (AF # 76.)  Of all the persons involved

in each of the meetings, only Baker, Patterson, and Mohan were Caucasian; the remaining attendees were African-American.  (AF # 79.)

**C.     Procedural History Relevant to Baker's Separation from the BBOE**

On November 19, 2001, Principal Brown requested that Baker be terminated for: (1) failure to follow BBOE procedures; (2) unprofessional behavior; and (3) verbal threats to parents and supervisors.  (AF # 80.)

On February 26, 2002, the BBOE proposed the termination of Baker based upon failure to follow school procedures regarding reporting on and off work; unprofessional behavior; ineffective classroom management; and on the grounds of an inappropriate altercation with a student.  (AF # 81; Def's Ex. 8.)  On March 11, 2002, Baker contested the proposed cancellation of his contract.  (AF # 82.)

After the BBOE determined that Baker's contract should be cancelled, Baker filed a Notice of Appeal with the State Tenure Commission.  (AF # 83.)  The Commission upheld the BBOE's decision, and Baker was provided with a final notice of his termination, effective April 23, 2003.  (AF # 86.)

**D.     Proceedings in this Court**

Baker filed his Complaint on January 31, 2006.  (Doc. 1.) In the Complaint, Baker alleged two causes of action.  First, he alleged that the BBOE intentionally discriminated against him on account of his race.  *Id.* at 13.  Second, Baker alleged

9

that the BBOE retaliated against him for contacting Sherry Huff after Brown told Baker that he preferred to have a black coach.  (Doc. 18 at 27; Def's Ex. 1, 259-268; Def's Ex. 4, 57-58.)  Baker brought both actions pursuant to 42 U.S.C.§ 1981, by and through 42 U.S.C. § 1983.  *Id.*

This Court granted the BBOE's Motion for Summary Judgment (Doc. 13) on April 20, 2007.  (Doc. 24.)   In the decision, the court found that Baker's claim was barred by the statute of limitations.  (Doc. 23 at 7-8.)  Baker appealed the adverse decision, and the Eleventh Circuit reversed this Court's decision on June 25, 2008. *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336 (11th Cir. 2008).  The statute of limitations issue having been decided by the Eleventh Circuit, the court now considers the remainder of the BBOE's arguments to determine whether summary judgment is appropriate.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).  Once the moving party has satisfied its

responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id*. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir.1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir.1987) (citation omitted).

## IV.   ANALYSIS

### A.   The BBOE's Liability under Section 1983

Both counts of Baker's Complaint (Doc. 1) are based on 42 U.S.C. § 1981 by and through 42 U.S.C. § 1983.  (Doc. 1 at ¶¶ 13, 15.)  Claims brought under Section 1981 against state actors merge into Section 1983 claims, which form the sole basis for relief.  *Butts v. City of Volusia*, 222 F.3d 891, 893 (11th Cir. 2000); *see also Moore v. Alabama Dep't of Corrections*, 137 Fed. Appx. 235, 237 (11th Cir. 2005)

(citing *Butts* and finding that Section 1981 and 1983 claims merged); *Busby v. City of Orlando*, 931 F.2d 764, 771 n. 6 (11th Cir. 1991) (finding that Sections 1981 and 1983 were effectively merged prior to the 1991 amendments to Section 1981).  Thus, the court must determine whether Section 1983 permits Baker to recover against the BBOE, which is a municipal entity for purposes of Section 1983 analysis.

"The Supreme Court has placed strict limitations on municipal liability under [S]ection 1983." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). "*Monell v. Department of Social Services*, 436 U.S. 658 (1978), holds that local governments (and branches thereof) may not be held liable for constitutional deprivations on the theory of *respondeat superior*.  Rather, they may be held liable only if such constitutional torts result from [1] an official government policy, [2] the actions of an official fairly deemed to represent government policy, or [3] a custom or practice so pervasive and well-settled that it assumes the force of law." *Denno v. School Bd. of Volusia County, Fla.*, 218 F.3d 1267, 1276 (11th Cir. 2000).  Finally, local governments may be held liable "when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." *Matthews v. Columbia County*, 294 F.3d 1294, 1297-1298 (11th Cir. 2002). School boards constitute branches of local government and thus may be subject to liability under *Monell*.  *See Arnold v. Board*

*of Escambia County*, 880 F.2d 305, 310 (11th Cir.1989).  With this framework in mind, the Court first determines whether the BBOE is liable on the basis of adopting an official policy or a custom.  Next it looks to whether the actions of Brown may be deemed to represent municipal policy.  Finally, the Court looks to determine whether the BBOE may be liable on the basis that it ratified Brown's conduct.

    1.    The BBOE is not liable on a theory of municipal policy or custom.

"To impose liability on a municipality under Section 1983, the plaintiff must identify a municipal 'policy' or 'custom' causing the deprivation of federal rights." *Sauls v. Pierce County School Dist.*, 399 F.3d 1279, 1287-1288 (11th Cir. 2005) (quoting *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997)).  In other words, "recovery from a municipality is limited to acts that are, properly speaking, acts of the municipality–that is, acts which the municipality has officially sanctioned or ordered."  *Davis v. Dekalb County School Dist.*, 233 F.3d 1367, 1375 (11th Cir. 2000) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986)).  These policies may be set by the government's lawmakers, "or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694.  A court's task is to "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at

issue." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

In *Tucker v. Talladega City Schools*, 171 Fed. Appx. 289 (11th Cir. 2006), the plaintiff was a discharged African-American employee who brought an action against the school board, as well as other individuals, who terminated him. The district court had determined that Tucker failed to demonstrate that the Board had an official policy of retaliation against employees such as Tucker, and therefore it granted summary judgment based on the school board's *Monell* defense. *Id.* at 297-298. On appeal, the Eleventh Circuit noted that the district court had improperly applied *Monell*, because Tucker had presented evidence of direct liability as opposed to indirect liability through *respondeat superior*. *Id.* As a result, Tucker did not have to produce evidence of a policy or custom, but instead only had to show that the school board had committed the substantive elements of the Section 1983 cause of action, since the school board had final policy-making authority. *Id.* Under this analysis, Tucker had presented sufficient evidence to create a jury question on this issue, and therefore summary judgment was inappropriate. *Id.* at 299-300.

Because it is an unpublished opinion, *Tucker* is only persuasive authority for this Court. *See Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337 (11th Cir. 2008). However, due to its factual similarities, the Court finds it necessary to discuss *Tucker*. Unlike the plaintiff in *Tucker*, Baker has not presented a direct liability

14

claim.  Instead, Baker argues (and the BBOE concedes) that the BBOE had final

policy-making authority. (Doc. 18 at 34.)

> Here, the Birmingham Board of Education has the final authority
> in personnel decisions. The Board accepted Mr. Brown's version
> of events and disregarded his pitiful to non-existent investigation,
> in which he did not even bother to interview more than one
> eye-witness. (Def.'s Ex. 3, 85:13-16.) Mr. Brown's harassment of
> Coach Baker was a direct result of his racist desire to have an "all
> black faculty". There was a persistent practice of racial
> discrimination in evaluating Coach Baker's work performance, and
> his termination stemmed from an altercation with an
> African-American student and his parents.

(Doc. 18 at 34.)  Based on the plain language of Baker's argument, there are no

allegations or citations to the record indicating that the BBOE maintained a custom

or policy of discriminating against white employees like Baker.  Baker has not cited

to any evidence in the record of a racial or retaliatory animus by the BBOE, and he

has not taken the position (or provided supporting evidence) as the plaintiff in *Tucker*

did that "[Baker] was arguably a continuing thorn in the B[OE]'s side . . . [and] that

the B[OE] ... [was] 'laying in wait' for [Baker]."  171 Fed. Appx at 299.  The court

is not required to construct arguments for the plaintiff, and having failed to cite any

authority or evidence for this basis of liability, Baker cannot prevail on this avenue

of liability.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.

1995) ("There is no burden upon the district court to distill every potential argument

that could be based upon the materials before it . . . ."); *id*. ("the onus is upon the parties to formulate arguments.").

Baker has not identified or presented any evidence to demonstrate that he suffered injury due to a custom or policy authorized by the BBOE.  However, Baker argues that the BBOE can be held liable for the acts of Brown because he recommended the termination of Baker and because Brown had a "racist desire to have 'an all black faculty.'"  (Doc. 18 at 33.)  Thus, the Court next looks to whether the BBOE can be held liable based on Brown's racial animus.

2.     Brown is not a final policymaking official under Alabama law.

Although Baker has not provided evidence of an official custom or policy, this is not the only way that the city may be held liable under Section 1983.  "A 'municipal act' is not, however, limited to decisions made by the city's official legislative body or in written agreements.  City policy also may be implicated by the acts of individual policymaking officials . . . ."  *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1480 (11th Cir. 1991). Under this theory, a city is responsible for any actions taken by the particular official who "possesses final authority to establish municipal policy with respect to the action ordered."  *Pembaur*, 475 U.S. at 481.  In his brief, Baker cites to *Brown* and indicates that the BBOE may be held liable under Section 1983 because of Brown's role as an official with policymaking authority.

16

(Doc. 18 at 34.)   However, "[w]hether a particular official has final policymaking authority is a question of state law." *Brown*, 923 F.2d at 1479.   The Court therefore must initially determine whether Brown has final policymaking authority.

In *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, the plaintiff, a white coach and athletic director, brought suit under Section 1981 and 1983 against the school district and principal, a black male, for transferring him to a different position.   The plaintiff, Jett, had initially been recommended for termination by the principal at his school, but the district personnel director only recommended his transfer.   *Id.* at 706.   A jury entered a verdict for Jett.   *Id.* at 708.   The Fifth Circuit reversed the decision, finding that the district could not be held liable under Section 1983.   *Id.*  at 710.   The Supreme Court granted *certiorari* and directed part of its opinion to the issue of whether the district could be held liable on the grounds that the principal or the superintendent were vested with final decision-making authority, thereby subjecting the district to liability under Section 1983.   *Id.* at 737.   The Court recognized that "whether a particular official has 'final policymaking authority' is a question of state law."   *Id.* (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)).   Recognizing that the Court of Appeals was more familiar with Texas law, the Court remanded for further consideration of whether state law made the superintendent a final decisionmaker.   *Id.* at 738.

On remand, the Court of Appeals looked to Texas law and concluded that "policymaking authority rested exclusively with the DISD board of trustees." *Jett v. Dallas Independent School Dist.*, 7 F.3d 1241, 1251 (5th Cir. 1993). It reached this conclusion by looking to the Texas Code of Education. *Id*. at 1245. Having concluded that there was no legal authority from which to find that the superintendent[4] had final policymaking authority, the court further found that there was no evidence of any delegation of authority either, and it found no evidence of a series of decisions by the superintendent that would have made the district aware of his improper motives. *Id.* at 1251.

In *Brown*, an African-American police officer sued the city, his immediate supervisor, and the city manager after he was terminated from his job as a police officer. The plaintiff had received poor evaluations from his police chief, and after more than five years of service the chief notified him that he was being dismissed because of deficiencies in his performance. *Id.* at 1476. Following the notice from his immediate supervisor, the plaintiff received a letter from the city manager, who had technical authority to hire and fire all city employees. *Id*. This letter summarily

---

[4] The Fifth Circuit did not discuss whether the principal who recommended Jett's dismissal was a policymaking official, since the Supreme Court's opinion focused on the legal status of the superintendent. *Jett*, 7 F.3d at 1244 ("Preliminarily, we observe that the Court's remand order focuses on whether Superintendent Wright, not Principal Todd, had the requisite relevant policymaking authority.").

stated: "I have reviewed the circumstances surrounding this matter and I concur with [the police chief's] decision." *Id.* The district court dismissed the case against the city because there were no allegations of an official policy of the city. *Id.* at 1478.

The Eleventh Circuit reversed, noting that the district court had not accounted for the fact that the city could still be liable if a final policymaker had made an improper decision, or through a theory of custom. *Id.* The court recognized that "a municipal official who has final policymaking authority in a certain area of the city's business may by his or her action subject the government to Section 1983 liability when the challenged action falls within that authority." *Id.* Based on the allegations in the complaint, the court found that the "plaintiff's allegations against the police chief and city manager leave open the possibility of municipal liability based on the actions of a policymaker." *Id.* at 1480. Although the issue of whether either official was a final policymaker presented a question of state law, the court remanded the case for consideration by the district court on this issue. *Id.*

In his brief, Baker equates Principal Brown with the chief of police in *Brown v. City of Ft. Lauderdale*. (Doc. 18 at 33 ("[I]n this case as principal, Mr. Brown mirrors the Chief of Police, and the Board of Education possesses termination powers.").) Thus, as indicated by the courts in *Brown* and *Jett*, this presents a legal question as to whether Brown is a final municipal policymaker with respect to hiring

19

and firing.  Therefore, the Court looks to Alabama law in order to determine whether

Principal Brown was an official with final policymaking authority.

Alabama law grants school boards the authority to terminate the contracts of

employees.  This occurs through the recommendation of the superintendent and

without reference to any role by the principal.

> An employment contract with a teacher on continuing service
> status may be cancelled only in the following manner: The
> superintendent shall give written notice to the employing board and
> the teacher of the superintendent's intention to recommend a
> cancellation as provided in Section 16-24-8. Such notice shall state
> the reasons for the proposed cancellation, shall contain a short and
> plain statement of the facts showing that the cancellation is taken
> for one or more of the reasons listed in Section 16-24-8, and shall
> state the time and place for the board's meeting on the proposed
> cancellation, which meeting shall be held no less than 20 days and
> no more than 30 days after the receipt of such notice by the teacher.
> The notice shall inform the teacher that in order to request a
> conference with the board, the teacher shall file a written request
> with the superintendent within 15 days after the receipt of such
> notice. At such conference, which shall be public or private at the
> discretion of the teacher, the teacher, or his or her representative,
> shall be afforded the opportunity to speak to the board on matters
> relevant to such cancellation. The teacher shall have the right to
> counsel and to have a court reporter record his or her statement,
> both at the expense of the teacher. <u>Thereafter, the board shall
> determine whether such cancellation shall be effectuated</u>.

Ala.Code § 16-24-9(a) (Supp. 2005) (emphasis added); *see also Ex parte Alabama*

*State Tenure Com'n*, 825 So.2d 805, 807 (Ala. 2001) ("In order to cancel a tenured

employee's contract, the Board must comply with the procedure provided by §

16-24-9.”); *Brown v. Alabama State Tenure Commission*, 349 So.2d 56, 58 (Ala. Civ. App. 1977)(citing to a prior version of Section 16-24-9, 1953 Ala. Laws 1040, and noting “[t]he cancellation of a teacher's contract is the sole prerogative of the employing board of education. It may be said it is the superintendent who proposes cancellation. That is probably the usual case. However, the board does not have to accept the proposal. Only the board may determine that cause exists for cancellation and that notice to the teacher shall be given and a hearing thereon held.”).

Given the specific language of the above Alabama statute and the interpretations related by Alabama courts, it is clear that state law does not vest Principal Brown with the authority to act as a final municipal policymaker with regard to the hiring and firing of tenured teachers such as Baker. Therefore, this case is distinguishable from *Brown*, since Alabama law clearly indicates that Principal Brown, unlike the police chief in *Brown*, lacked any policymaking authority to terminate Baker. Therefore, Principal Brown was not a final municipal policymaker, and municipal liability cannot be predicated on this basis.

3.      The BBOE may be held liable on the basis of ratification.

While Baker has failed to demonstrate that Brown was an official with policymaking authority to fire teachers, he may alternatively prove the existence of a policy or custom by demonstrating that the BBOE delegated final policymaking

authority to Brown or ratified his actions.  *Mandel v. Doe*, 888 F.2d 783, 791 (11th

Cir. 1989)(citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 834 (1985)).

> [Entity] liability on the basis of ratification exists when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority. *See generally, Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 998 (11th Cir.1990). The final policymaker, however, must ratify not only the decision itself, but also the unconstitutional basis for it. *Gattis v. Brice*, 136 F.3d 724, 727 (11th Cir.1998) ("A policymaker's approval of an unconstitutional action can constitute unconstitutional county policy only when the policymaker 'approve[s]' a subordinate's decision and the basis for it.' ") (quoting *Praprotnik*, 108 S.Ct. at 926).

*Matthews v. Columbia County*, 294 F.3d 1294, 1297-1298 (11th Cir. 2002).

The Supreme Court initially recognized the possibility that ratification could

provide an additional basis for municipal liability under Section 1983 in *City of St.*

*Louis v. Praprotnick*, 485 U.S. 112 (1988) (plurality opinion).  There, the plaintiff

was an architect for the city who was initially suspended from his position for

obtaining private employment without prior approval.  The city's Civil Service

Commission found the decision to be too harsh, and reversed the suspension.  *Id.* at

114.  Subsequent to this determination, the plaintiff received poor performance

evaluations (his prior evaluations had been extremely favorable) and the plaintiff

appealed the poor evaluations, which the Civil Service Commission again reversed

in part. *Id.* at 115.  Over a year later, the plaintiff was transferred from his position

and then was subsequently terminated the following year in the midst of budget cuts.

*Id.*

The plaintiff filed suit under Section 1983 alleging, among other things, that

the City retaliated against him for exercising his First Amendment rights in appealing

adverse decisions by his supervisor.  *Id.* at 116.  He alleged that his supervisors had

been angered by his appeal and had transferred this animosity to a new

administration, with new supervisors, who subsequently transferred and laid off the

plaintiff. *Id.* at 128.  The district court found that the city could be held liable for the

decisions of the plaintiff's supervisors. *Id.* at 117.  The Supreme Court however,

found that the applicable state law established that the mayor, aldermen, and civil

service commission had final policymaking authority, not the plaintiff's immediate

supervisors.  *Id.* at 126.  Additionally the Court noted that "a federal court would not

be justified in assuming that municipal policymaking authority lies somewhere other

than where the applicable law purports to put it." *Id.*

In reaching this decision, however, it recognized the possibility that an official

with legal authority to make final policy decisions, may nevertheless delegate that

authority and thereby expose the city to liability when the subordinate makes

unconstitutional decisions.

[S]pecial difficulties can arise when it is contended that a municipal policymaker has delegated his policymaking authority to another official. If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability. If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose. It may not be possible to draw an elegant line that will resolve this conundrum, but certain principles should provide useful guidance.

First, whatever analysis is used to identify municipal policymakers, egregious attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded by a separate doctrine. Relying on the language of § 1983, the Court has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law. That principle, which has not been affected by *Monell* or subsequent cases, ensures that most deliberate municipal evasions of the Constitution will be sharply limited.

Second, as the *Pembaur* plurality recognized, the authority to make municipal policy is necessarily the authority to make final policy. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. <u>If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.</u>

*Id.* at 126-127. (emphasis added)

Applying this analysis to the facts, the Court found that there was no evidence

from which to find that final policymaking authority had been delegated to the plaintiff's supervisors, even though the Civil Service Board adopted the recommendations of the subordinates.

> Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them. It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker . . . . [T]he mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale. In such circumstances, the purposes of § 1983 would not be served by treating a subordinate employee's decision as if it were a reflection of municipal policy.

*Id.* at 130.

Thus, the Court found that there was no basis to expose the city to municipal liability on these grounds.

Following the example of the Supreme Court in *Praprotnik*, the Eleventh Circuit addressed liability on the basis of ratification in *Gattis v. Brice*, 136 F.3d 174 (11th Cir. 1998).   There, a Palm Beach County firefighter claimed that he was demoted because he exercised his First Amendment rights.  *Id.* at 725.  The plaintiff's supervisor did not have the authority to demote him, but he recommended his

demotion to the Administrator, who adopted the recommendations of the plaintiff's supervisor. *Id.* at 726. Citing to *Praprotnik*, the court held that "a policymaker's approval of an unconstitutional action can constitute unconstitutional county policy only when the policymaker approves a subordinate's decision and the basis for it." *Id.* at 727. In this instance, there was no evidence that in adopting the recommendation of the plaintiff's supervisor, the Administrator knew of and ratified the retaliatory motive of his subordinates. *Id.* Accordingly, there was no basis to find that the Administrator's adoption of the recommendation constituted unconstitutional county policy; therefore summary judgment was granted against the plaintiff. *Id.*

Baker's case differs from *Praprotnik* and *Gattis*. Unlike either of these cases, the recommendation of the subordinate (Principal Brown) was known by the BBOE to potentially have an improper motive. This was plainly evident from Baker's hearing.

Baker's hearing took place over three non-consecutive days, June 19, 2002 (Def's Ex. 2), February 26, 2003 (Def's Ex. 3), and March 29, 2003 (Def's Ex. 4). At this hearing, Baker was represented by his current counsel, and he was permitted to put on his own witnesses and evidence, as well as cross-examine witnesses presented by the BBOE.

Based on the transcript of this hearing, the BBOE would have been well aware

of the discriminatory motive in Brown's recommendation.  It was of primary focus in

Baker's opening statement (Def's Ex. 2, 23-24 ("[T]his is a case about race

discrimination . . . . You will hear testimony that when he met John Brown . . . Mr.

Brown said to him I didn't want you here.  I would have preferred to have a black

coach at my school or an all-black staff.").)  Baker provided testimony of Brown's

racial animus.  (Def's Ex. 4, 57:9-11 ("[Brown] said I didn't get to choose my coach.

You're here by somebody else, and I preferably wanted a black coach.").  Baker's

attorney questioned Brown about his racially charged statements.  (Def's Ex. 2, 133-

134 (asking Brown whether he told Baker that he wanted a black coach and stating

"Mr. Brown, isn't this proceeding all about race?").)  Finally, Brown's racial

prejudice towards Baker was a significant focus of the closing argument.  (Def's Ex.

4, 402:12-18 ("Bruce has told you the second day on the job his principal says I didn't

want you.  I wanted a black coach.  We may address that one in another forum one

day, too, but for today that unrebutted that Bruce says the principal told me I didn't

want you.  I wanted a black coach.").)

Given Baker's testimony and its importance in the defense presented at his

termination hearing, the BBOE would have been aware of Brown's discriminatory

animus in requesting the termination of Baker.  Based on this evidence, a reasonable

juror could find that the BBOE ratified the unconstitutional motives of Brown in

terminating Baker.  Therefore, the BBOE's adoption of Brown's recommendation may

have constituted an unconstitutional policy.  As a consequence, municipal liability

under Section 1983 has not been foreclosed as to the BBOE, since there are disputed

facts that may give rise to an inference that the BBOE approved of the improper basis

for Brown's recommendation.  *See Gattis v. Brice*, 136 F.3d at 727.  Since the BBOE

could potentially[5] be held liable as a local government entity under the remedial

vehicle of Section 1983, the Court now turns to the merits of Baker's respective

claims under Section 1981.

## B.    Baker's Intentional Discrimination Claim

The elements required to prove a claim of intentional discrimination under

Section 1981 are the same as those required to prove a claim of intentional

discrimination under Title VII.  *Howard v. BP Oil Co.*, 32 F.3d 520, 524 n. 2 (11th

Cir.1994).  Thus, as would be the case under Title VII, Baker may prove his claim of

---

[5]  The fact that the BBOE could <u>potentially</u> be subject to municipal liability does not mean that summary judgment is due to be denied.  The BBOE can alternatively prevail on its motion by demonstrating that there is no underlying constitutional violation, since "[o]nly when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise." *Vineyard v. County of Murray, Ga.*, 990 F.2d 1207, 1211 (11th Cir. 1993). *See also Beshers v. Harrison*, 495 F.3d 1260, 1264 n. 7 (11th Cir. 2007) (declining to address claims of municipal liability when the court concluded "no constitutional violation occurred."); *Hooper v. City of Montgomery*, No. 2:06-CV-612-ID 2007 WL 2069851 at *3 (M.D. Ala. July 17, 2007) ("[W]here there is no underlying constitutional violation by a municipal actor, liability under § 1983 cannot attach to the municipality.").
.

intentional discrimination either through direct evidence, circumstantial evidence, or by using statistics.  *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990); *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1322-23 (11th Cir.2006).  Baker relies on circumstantial evidence to prove his claim, and therefore the court will apply the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), to evaluate Baker's claim.

Under this framework, the plaintiff must first establish a prima facie case which consists of showing that (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated  employees more favorably; and (4) he was qualified to do the job."  *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir.2000). If the plaintiff is successful in satisfying these elements, he creates a presumption of discrimination, which defendants may rebut by providing a legitimate, nondiscriminatory reason for the adverse action. *McCann v. Tillman*, 526 F.3d 1370, 1372 (11th Cir. 2008) (citing *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir.2006)).

In the final step of the burden-shifting analysis, if the employer meets "its burden of production, the presumption of discrimination is rebutted, and the inquiry proceeds to a new level of specificity, in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Rioux v. City of*

*Atlanta, Ga.* 520 F.3d 1269, 1275 (11th Cir. 2008) (internal quotation marks and citations omitted). At this stage, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997)).

> [A]  plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 148 (2000).

In *Moore v. Sears Roebuck and Co.*, the Eleventh Circuit explained that "for an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the

defendant in good faith believed plaintiff's performance to be unsatisfactory and that the asserted reason for the discharge is therefore not a mere pretext for discrimination." 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (citing *Texas Dep't of Community Affairs v.Burdine*, 450 U.S. 248 (1981). "'A plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason' as long as 'the reason is one that might motivate a reasonable employer.'" *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001). "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (citing *Alexander v.Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir.2000)). "To find in favor of the employer, a finder of fact 'need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory.'" *Holder v. Nicholson*, No. 07-14561 2008 WL 2812481 (11th Cir. July 23, 2008) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)). "A reason is not

pretext for discrimination "unless it is shown both that the reason was false, and that discrimination was the real reason." *Brooks v. County Com'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006).

The parties have agreed that Baker has established a prima facie case of intentional discrimination, thereby discharging his initial burden. (Docs. 14 at 16, 18 at 25, 20 at 6.)  The BBOE discharged its burden by offering evidence to suggest that Baker was terminated for the statutory ground of "other good cause." (Def's Ex. 44.) Based on the superintendent's letter recommending discharge, the specific grounds for "other good cause" includes Baker's improper altercation with Moultrie.  (*Cf.* Def's Ex. 8.)  Thus, in order to prevail, Baker must show that the proffered reasons are merely a pretext for discrimination by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Rioux*, 520 F.3d at 1275.

Baker has made no such showing.  In attempting to demonstrate pretext,[6] Baker argues that he was "far from incompetent," that he only received satisfactory ratings

---

[6]  Baker's only arguments as to pretext occur in the section of his brief devoted to his retaliation claims.  (Doc. 18 at 30-31.)  However, since the burden shifting framework is the same in this aspect of Section 1981 claims, the court will address these arguments as if Baker also raised them in relation to his intentional discrimination claims.

for classroom management, and that his only act of insubordination was calling the program specialist after Brown's racist remarks.  (Doc. 18 at 31-32.)

These explanations simply do not address the BBOE's proffered nondiscriminatory reasons, much less satisfy Baker's burden on this issue.  The school superintendent recommended Baker's termination based upon the following "statutory grounds": "incompetency, insubordination, neglect of duty, failure to perform duties in a satisfactory manner, and other good and just cause."  (Def's Ex. 8.)

After citing the statutory grounds, the letter cited the "specific reasons supporting the grounds," which included "you have failed to follow school procedures regarding reporting on and off of work; you have engaged in unprofessional behavior on the job with students, faculty and staff; you have had ineffective classroom management; and on or about October 15, 2001 you were involved in an inappropriate altercation with a student and subsequently behaved inappropriately at meetings with the student's parents and the various faculty."  *Id.* While these were the recommendations for termination, the only official ground cited for Baker's termination in the official notice was "other good and just cause."  (Doc. 44.)

Notably, the only specific reason cited in the superintendent's letter that

corresponds to the statutory basis for Baker's termination ("other good and just cause") is his improper altercation with Moultrie, his parents, and the faculty. Incompetence, failure to perform duties in a satisfactory manner and insubordination were not grounds for dismissal cited in the official notice.

Baker has offered insufficient evidence to demonstrate that the BBOE's proffered legitimate nondiscriminatory reason for his discharge "other good and just cause" was merely a pretext for discrimination.   Critically, Plaintiff has not demonstrated that the BBOE lacked a good faith, honest belief in deciding to discharge Baker on the basis of his inappropriate altercation with Moultrie and his subsequent inappropriate behavior at meetings with Moultrie's parents and the faculty. Therefore, the BBOE's Motion for Summary Judgment is due to be **GRANTED** on Baker's § 1981 race discrimination claim because Baker has not met his burden under the *McDonnell Douglas* framework.

### C.    Baker's Retaliation Claim

The elements required to establish retaliation claims under Section 1981 are the same as those required for Title VII claims. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1278 (11th Cir.2008).   To address the BBOE's Motion for Summary Judgment as to this claim, the court must engage in a burden-shifting analysis similar to the one it applied to Baker's intentional discrimination claims *supra*.

To establish his claim of retaliation under Section 1981, Baker must prove that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was some causal relation between the two events. *Goldsmith*, 513 F.3d at 1277 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, (2006)). After the plaintiff has established this prima facie case, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action. *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073, 1075 n. 54 (11th Cir.1995). Ultimately, the plaintiff must bear the burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct. *Goldsmith*, 513 F.3d at 1277.

As is the case with Baker's intentional discrimination claim, Baker has established a *prima facie* case. (Docs. 18 at 27-30.) Baker engaged in a statutorily protected activity when he sought to report Brown's racist remarks to Sherry Huff. (Def's Ex. 4, 57-58.) Baker suffered an adverse action when he was terminated from his position. (Def's Ex. 44.) Finally, there was a causal connection between the protected activity and the adverse action, since they occurred merely a few weeks apart. Further, the BBOE has not challenged that Baker has established a *prima facie* case. (Doc. 21 at 7-8.)

The BBOE has offered legitimate nonretaliatory reasons for its discharge of Baker, namely that he was terminated for "other good and just cause." (Doc. 44.) The BBOE's statutory basis for termination corresponds to the specific reason in the superintendent's letter recommending termination that Baker was involved in an inappropriate altercation with a student and behaved inappropriately at subsequent meetings with the student, his parents, and the faculty. (Doc. 8.)

As discussed *supra*, Baker has not satisfied his burden of the showing that the BBOE's proffered nonretaliatory reasons are merely a pretext. As a consequence, the BBOE's Motion for Summary Judgment (Doc. 13) is due to be **GRANTED** on the ground that Baker has not satisfied his burden under the applicable framework for retaliation claims.

### D.     The BBOE's liability under the "cat's paw" theory of causation.

While Baker has presented no evidence to suggest that the BBOE discriminated against him, he could alternatively prevail on both of his Section 1981 claims by showing that he was fired for discriminatory and/or retaliatory reasons based on the BBOE's acceptance of a biased recommendation; this is known in the Eleventh Circuit as the "cat's paw" theory of liability. *Stimpson v. City of Tuscaloosa* 186 F.3d 1328, 1332 (11th Cir.1999). The cat's paw theory establishes the causation element of a discrimination claim when "the plaintiff shows that the decisionmaker

followed [a] biased recommendation without independently investigating the complaint against the employee." *Id.*

The plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee. *Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1249 (11th Cir.1998) ("the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation . . . . In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers."). "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Crawford v. Carroll*, 529 F.3d 961, 979 (11th Cir. 2008) (quoting *Stimpson* 186 F.3d at 1332); *see also*, *Llampallas*, 163 F.3d at 1249 ("In effect, the harasser is the decisionmaker, and the titular 'decisionmaker' is a mere conduit for the harasser's discriminatory animus.").

While Baker does not explicitly mention the cat's paw theory of liability, he does appear to implicate it in the section of his brief directed to pretext. (Doc. 18 at 31 ("The Board's reasons for terminating  Coach Baker are clearly false and stem from their ratification of Mr. Brown's retaliatory and discriminatory behavior.").)

Therefore, out of an abundance of caution, the court addresses the substance of this theory of liability.  However, because Baker presents no evidence that the BBOE conducted anything but an independent investigation, or was motived by any dicriminatory and/or retaliatory animus of Brown as the recommender, the Court finds that the record does not support "cat's paw" liability in this case.

In *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328 (11th Cir.1999), the Eleventh Circuit explored the contours of the cat's paw theory of liability in a factual setting similar to the current one.  There, the plaintiff was a city police officer who was terminated after an incident of misconduct at a health center while in uniform, not entirely unlike Baker's conduct regarding his incident with Moultrie.  *Id.* at 1331. Under Alabama law, the City did not have the power to unilaterally terminate the plaintiff; instead, only the Civil Service Board had this power.  *Id.*  The Civil Service Board terminated the plaintiff after a three day hearing, in which the plaintiff had the opportunity to present her own evidence and was represented by counsel.  *Id.* at 1330. Since the plaintiff alleged that the City offered a biased recommendation, the court explored the cat's paw theory of liability.  *Id.* at 1331-1332.  The court found that the plaintiff had not introduced any evidence to show that the Board acted as a "'cat's paw' or rubber stamp for the City's recommendation."  *Id.* at 1332.

The court wrote, "the evidence shows that the Board has the sole power and

discretion to terminate police officers, that its members are appointed by the Governor of Alabama, that it conducted a three day hearing to investigate the charges, and that during the hearing Stimpson was represented by legal counsel and was allowed to put on defense evidence and witnesses.  It is hard to imagine any other procedural device that would ensure a more fair and independent decision than that of the Civil Service Board."  *Id.*  Additionally, the court noted that the plaintiff had not raised the issue of discrimination to the Civil Service Board.  Finally, the court limited the nature of its holding, noting that it "need not announce a bright line at which an independent investigation becomes a rubber stamp to resolve this case, because the record before us does not contain any hint of a cat's paw arrangement."  *Id.*

The facts in the current case are somewhat distinct from the ones in *Stimpson*, because the record indicates that, unlike the plaintiff in *Stimpson*, Baker raised the issue of discrimination in his hearing.  *See supra* at 26-28.  Additionally, *Stimpson* involved the decision of a civil service board, whose members had been appointed by the Governor.  186 F.3d at 1330.  A school board could possibly be less insulated than a civil service board.  Thus, the Court looks beyond *Stimpson* to determine whether the BBOE's own hearing was sufficiently independent to avoid cat's paw liability.

39

Following *Stimpson*, the Eleventh Circuit has not endeavored to draw the bright line it declined to announce in that case.  It has only addressed cases with similar facts in unreported cases, which are not binding on this Court. *See Baker v. Birmingham Bd. of Educ.*,  531 F.3d 1338.

In *Tucker v. City of Talladega*, 171 Fed. Appx. 289, discussed *supra* at 13-14, the court recognized that the plaintiff had made no showing that the Board who terminated him acted as "a conduit to give effect to the recommender's discriminatory animus." *Id.* at 297.  After receiving a recommendation from an allegedly biased supervisor, the Board held a four day hearing in which the plaintiff was represented by counsel and was able to put on his own evidence and defense.   The court recognized that "[t]he facts relating to the procedure  used for the termination in this case fall squarely within the holding of *Stimpson*, and therefore Tucker is unable to establish a genuine issue of material fact that his termination was the direct result of any retaliatory animus . . . ." *Id.*  However, in reaching its decision, the court did not discuss whether the plaintiff had raised the issue of discrimination during the hearing.

In another unreported decision, *Roberts v. Randstand North America, Inc.*, 231 Fed. Appx. 890 (11th Cir. 2007), the Eleventh Circuit found that a decisionmaker may consider the information provided by a biased recommender in conducting its own independent investigation. *Id.* at 896.  There, the plaintiff alleged that he was

improperly terminated on account of his gender.  Although the court found that there was insufficient evidence to show discriminatory animus, *id.* at 895-896, the court went on to discuss the plaintiff's cat's paw theory.  The court rejected the plaintiff's argument that the cat's paw theory applied because the decisionmaker relied on a biased supervisor's recommendation in reaching his decision.  *Id.* at 896.

It reached this conclusion because the plaintiff was terminated "only after an independent analysis of [his] employment. While [the decisionmaker] considered information that [the biased supervisor] relayed . . . [the decisionmaker] met with [the plaintiff] personally, and drew upon information concerning multiple sources, and independently evaluated [his] employment." *Id.*  For this reason, the cat's paw theory failed on independent grounds. *See also*, *Foster v. Mid State Land & Timber Co., Inc.*, No. 2:06-CV-405-ID, 2007 WL 3287345 at *16 (M.D. Ala. Nov. 5, 2007) (citing *Roberts* and explaining that "[the plaintiff] cannot succeed on a cat's paw theory based solely on an assertion that [the decision-maker] considered reports from [a biased supervisor] about [the plaintiff's] job performance, and his attempt to do so impermissibly dilutes the cat's paw theory of liability").

Other circuits have also not identified a firm distinction between an

41

independent investigation and a rubber stamp,[7] but some courts have relied on *Stimpson* in finding that an independent investigation can absolve a decision-maker from cat's paw liability, even when he or she considers or is aware of a recommender's bias.

In *Natay v. Murray Sch. Dist.*, 119 Fed. Appx. 259 (10th Cir. 2005), the plaintiff claimed that she had been discriminated against by her administrator from the beginning of her employment with the school district. *Id.* at 260. She claimed that the administrator had disciplined her, while not disciplining other teachers for the same conduct such as arriving late from lunch. *Id.* She was also informed that she was culturally and racially "out of place" by her supervisor. *Id.* The administrator recommended that the plaintiff be terminated, and due to concern about a charge of discrimination, the school superintendent was asked to conduct an independent investigation. *Id.* This investigation involved meetings with the plaintiff, visits to the classroom, and reviewing letters from parents, students, and colleagues. *Id.* It did not involve a hearing at which the plaintiff was represented by counsel as in the current case and in *Stimpson*.

Subsequently, the school superintendent held a conference with the plaintiff

---

[7]  The court conducted an exhaustive search in this regard, because it considers the issue important to the resolution of this case, but it has not uncovered any case that defines the distinction more clearly than *Stimpson*.

to listen to her arguments as to why she should keep her job. *Id.* at 261. Following these steps, the superintendent decided not to renew her contract. *Id.* Based on these facts, the court reached the following conclusion as to the cat's paw theory of liability: "A cat's paw claim cannot be maintained when the ultimate decision maker conducted an independent investigation and also allowed the plaintiff a chance to respond directly to the reasons for the decision. The evidence of record establishes a sufficiently independent investigation by [the superintendent] to insulate his decision from any bias of a subordinate." *Id.* at 262. In reaching this decision, the court cited *Stimpson*, and noted that "[a]n important factor is whether, during the course of the investigation, the decision maker allows the claimant to give his version of events." *Id.*

In another case relying on *Stimpson*, the Tenth Circuit in *English v. Colo. Dept. of Corrections*, 248 F.3d 1002 (10th Cir. 2001), recognized that even if a factual investigation was biased, an independent investigation would cure the impact of that bias. *Id.* at 1011.

In *English*, the plaintiff was discharged after it was alleged that he had an improper sexual relationship with a prisoner. The plaintiff, who was black, alleged that his investigators were prejudiced against him and it therefore tainted the decision to terminate him. Assuming that the investigators were biased, the Tenth Circuit

43

found that the plaintiff "[had] not demonstrated that [the decisionmaker] accepted [the biased investigators'] findings as a rubber stamp without independent investigation. To the contrary, [the decisionmaker] held two meetings with [the plaintiff] and his attorney in which [he] was asked to provide evidence rebutting or mitigating the investigators' findings . . . . A plaintiff cannot claim that a firing authority relied uncritically upon a subordinate's prejudiced recommendation where the plaintiff had an opportunity to respond to and rebut the evidence supporting the recommendation." *Id.* (citing *Stimpson*, 186 F.3d at 1332). As a result, the cat's paw doctrine did not apply. *Id.*

Looking to the Eleventh Circuit's unreported cases and similar cases from other circuits that have relied on *Stimpson*, the Court finds that the BBOE's hearing was sufficiently independent so as not to constitute a rubber stamp of Brown's recommendation.

The BBOE, as in *Stimpson* and *Tucker*, held a hearing regarding Baker's termination in which numerous witnesses testified. (Def's Exs. 2-4.) Baker was represented by counsel at this hearing, and he had the opportunity to cross-examine each witness before presenting his own case. *Id.* Baker's termination was the ultimate result of that independent hearing.

Baker complains that Brown conducted an investigation into the incident with

44

Moultrie that was less than thorough.  Specifically, he complains that Brown spoke only with Moultrie in conducting his investigation, and he never questioned Baker to determine his version of the incident.  (Def's Ex. 2, 85-86.)  This evidence is not relevant to the cat's paw theory of liability, because the Court's inquiry concerns whether the <u>BBOE</u> conducted an independent investigation that did not amount to a rubber stamp of Brown's recommendation.  Baker's contention is similar to the argument rejected by the Tenth Circuit in *English*, where the court assumed an investigation to be biased, but nevertheless concluded that there was no basis for cat's paw liability.  248 F.3d at 1011. As in that case, crucial to this Court's own analysis is the fact that the BBOE conducted its own investigation through its hearing process, and it did not merely rely on Brown's allegedly biased investigation and recommendation.

In contrast to Brown's cursory investigation, the BBOE conducted its hearing in an even-handed manner, going through great lengths to ensure the fairness of its hearing.  Baker was represented by counsel.  He was allowed to present witnesses and cross-examine the administration's witnesses.  He was not limited in the number of witnesses he could call; indeed, one member of the panel went out of her way to ask Baker if he was going to call Sherry Huff as a witness; Baker declined to do so. (Def's Ex. 4, 643: 21-22.)  Moreover, Baker has in no way challenged the fairness of

45

the hearing itself.

It does not change the court's conclusion that Brown testified at the hearing and that his testimony presumably factored into the decision. Similar to the Eleventh Circuit's reasoning in *Roberts* and Judge DeMent's reasoning in *Foster*, the decision was based upon the interview of multiple sources other than Principal Brown. *See* 231 Fed. Appx. at 896; 2007 WL 3287345 at *17. In addition to Principal Brown, the BBOE also heard testimony from other BBOE employees such as Ms. Anderson, Christie Lyons, Vanetta Newton, and Debra Patterson, as well as Baker's testimony and that of his only other witness, Nita Og. (Def's Ex. 2-4.) Additionally, as in the Tenth Circuit's decisions in *Natay* and *English*, Baker was provided ample opportunity to explain his story and to rebut the evidence presented by the administration. (Def's Ex. 4.)

Therefore, based on the extensive nature of the independent hearing provided over three days to Baker before his termination, the court finds that the cat's paw theory does not apply. The BBOE did not act as a conduit for Brown's animus, merely approving his recommendation without investigating the matter itself. There is no evidence that the BBOE conducted anything but an independent investigation.

## IV. CONCLUSION

Consistent with the reasoning in this Memorandum Opinion, the BBOE's

Motion for Summary Judgment is due to be **GRANTED**.   The BBOE has demonstrated that there are no genuine issues of material fact with respect to either of Baker's Section 1981 claims.    An Order consistent with this Memorandum Opinion will be entered.

     **DONE** and **ORDERED**, this the 30th day of October, 2008.


**VIRGINIA EMERSON HOPKINS**
United States District Judge